# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

EDWIN C. GRAY, SR.,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

No. C07-4067-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Edwin C. Gray, Sr. seeks judicial review of a decision by an adminis-trative law judge ("ALJ") denying his application for Title II disability insurance benefits. Gray claims the ALJ erred in rejecting the opinions of his treating sources and a vocational expert, and presenting an inaccurate hypothetical question to a vocational expert.  (*See* Doc. Nos. 17 & 23)

## II.  PROCEDURAL AND FACTUAL BACKGROUND
### A.  Procedural Background

Gray was born in 1953.  On October 2, 2003, he filed an application for disability insurance benefits, alleging a disability onset date of December 1, 2000.  (R. 96-98).  Gray claims he is disabled due to back problems, and nerve damage resulting from numerous back surgeries.  He claims these conditions prevent him from standing, sitting, or driving for very long, and restrict his ability to lift.  (R. 168)

Gray's application was denied initially and on reconsideration.  (*See* R. 74-75, 79-82, 85-89)  Gray requested a hearing, and a hearing was held on May 5, 2005, before Administrative Law Judge ("ALJ") John P. Johnson.  (R. 806-51)  Gray was represented

at the hearing by attorney Dennis Mahr. Gray testified at the hearing, and Vocational Expert (VE) William Tucker also testified. On November 22, 2005, the ALJ issued an unfavorable decision, finding that although Gray could not return to any of his past relevant work as a crane operator, he retained the residual functional capacity to perform other jobs existing in significant numbers in the national economy, such as production assembler, laundry folder, and bakery worker, and he therefore was not disabled. (R. 31-41)

Gray appealed the decision, and on March 19, 2007, the Appeals Council granted his request for review. (R. 22-25) On June 15, 2007, following its review of the case and additional evidence submitted by Gray, the Appeals Council concluded that Gray was under a disability for the time period from December 1, 2000, through April 3, 2003, but he was not under a disability during all other relevant time periods. (R. 9-18) The Appeals Council concluded that as of April 4, 2003, Gray's condition had improved to the point that he had "regained the residual functional capacity to perform a reduced range of work at the light exertional level . . . [such as] production assembler, laundry folder and bakery worker." (R. 15) The Appeals Council's decision represents the final decision of the Commissioner on Gray's application.

Gray filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 5) Gray does not contest the Appeals Council's decision that he became disabled on December 1, 2000. What he challenges is the decision that his disability ended on April 3, 2003. (*See* Doc. No. 17, p. 3)

In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Gray filed a brief supporting his claim on April 22, 2008. (Doc. No. 17) The Commissioner filed a responsive brief on July 22, 2008. (Doc. No. 20) Gray filed a reply

brief on August 12, 2008.  (Doc. No. 23)  The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Gray's claim for benefits.

## B.  Factual Background

### 1.  Introductory facts and hearing testimony

The period at issue in this case is April 4, 2003, to the present date.  The administrative record is voluminous, containing 851 pages.  Gray has set forth a detailed, accurate summary of the hearing testimony in his brief, with appropriate citations to the record.  The Commissioner "agrees with the factual assertions contained in [Gray's] brief[.]"  (Doc. No. 20, p. 2)  The court therefore adopts Gray's summary of the hearing testimony, and reproduces it here for the convenience of the reviewing judge:

> The administrative hearing was held May 5, 2005 in front of ALJ John P. Johnson.  A.R. 806-851.  Mr. Gray appeared and testified.  A.R. 809-844.  Dr. William Tucker testified as the vocational expert employed by SSA.  A.R. 806.  The ALJ's decision was not issued until November 22, 2005.  A.R. 31-41.

> Mr. Gray testified that he did graduate from high school.  A.R. 813.  He stated he was in special education classes.  A.R. 813.  Mr. Gray stated that he had a D average and that math and reading were difficult for him.  A.R. 813.  Mr. Gray indicated that he had had no schooling since leaving high school and that he had worked mostly as a laborer in factories after high school.  A.R. 813.  He had never had an office job.  A.R. 817.  He had never functioned as a foreman in any of the crane operator jobs he worked at.  A.R. 818.  He had never run a computer nor did he have a computer at his house.  A.R. 817.  He had never been on the Internet.  A.R. 818.

> Mr. Gray indicated that his wife had quit her job to help take care of him.  A.R. 812.  He noted that he had a total of four back surgeries (so far).  A.R. 812.  Mr. Gray never filed a worker's compensation claim after his first back surgery and

worker's compensation did not cover the costs of the first surgery.  A.R. 813.

He testified that he takes Celebrex which he says does not help at all with the pain.  He also took two pills twice a day of the narcotic drug Darvocet for his pain.  A.R. 820.  He testified that he cannot operate equipment when he takes the Darvocet because it makes him have trouble with his reflexes.  A.R. 820-821.  He testified that the side-effects from the medications include being really tired, not being able to perform like he is supposed to, not being able to concentrate or think right.  A.R. 828.  He took Tylenol as needed (A.R. 822) and Elavil for depression and to help him sleep at night.  A.R. 822.  Mr. Gray stated that he did not sleep through the night and got maybe four consecutive hours of sleep before he wakes up because of the pain.  A.R. 822.  He testified that his pain level is a 7 out of 10.  A.R. 822.  When he wakes up from the pain he takes Tylenol and walks around.  A.R. 822.  Before the injury to his back he testified that he slept eight hours a night.  A.R. 823.

He noted that during a typical day he takes a nap for about an hour.  A.R. 823.  He indicated that he feels tired during the day.  A.R. 823.  He testified he takes his grandchildren to school but does not leave the house to do anything else on a regular basis.  A.R. 824.  He did not grocery shop because it is "too hard to walk around and lift the groceries."  A.R. 824.  He thought he could lift about 10 pounds.  A.R. 824.

When asked about the functional capacity test conducted back in February, 2003 and whether he believed that he had gotten worse in the past 27 months, Mr. Gray testified the pain was worse and had increased in his lower back and that he had weakness in his left leg.  A.R. 824.  He testified that he felt like he would almost fall down because his left leg was so weak.  A.R. 825.  Mr. Gray testified he cannot climb, cannot carry things, cannot lift more than ten pounds, cannot push or pull with his legs, cannot run clutches, cannot push buttons, operate machinery or push or pull with his arms.  A.R. 826.  He cannot squat, bend or stoop because of the pain in his

lower back and stiffness.  A.R. 827.  He also testified that Dr. Meyer had discussed his having a fifth surgery to treat the ongoing back pain.  A.R. 827.

Mr. Gray indicated he can drive about 20 miles before he needs to get out and walk around because of the pain. A.R. 821.  Mr. Gray testified that he probably could stand up to half-an-hour before he would become uncomfortable from the pain.  A.R. 821.  He also could walk continuously without stopping for about one block.  A.R. 821.  He no longer had any hobbies or engaged in activities that he used to do prior to his chronic back pain.  A.R. 829-35.  He also testified that Dr. Meyer did not want him to do any lawn mowing because the vibrations from such equipment could cause more back pain.  A.R. 821-32.  He testified his financial condition was poor.  A.R. 829.  He noted that the last time that he had health insurance was probably in 2001.  A.R. 839.  Mr. Gray does not read or subscribe to any magazines.  A.R. 836.  At one time vocational rehabilitation was attempted.  A.R. 836. Mr. Gray has a very poor ability to manipulate objects.  A.R. 838.  The ALJ asked why Mr. Gray did not see Dr. Meyer more often and Mr. Gray answered that he still got his medication from Dr. Meyer.  A.R. 227, 842.  Mr. Gray testified he could walk or stand for about three hours during an eight-hour day and sit about four hours out of an eight-hour day.  A.R. 842.

(Doc. No. 17, pp. 19-22)

The ALJ asked VE William V. Tucker a hypothetical question that incorporated Gray's residual functional capacity as found by the ALJ.  The VE indicated an individual with that RFC could not return to Gray's past relevant work as a crane operator, and would have no transferable skills.  However, the individual could perform other unskilled, light work activity, such as laundry folder, bakery worker, and production assembler. (R. 847-49)

The ALJ asked the VE a second hypothetical question that Gray characterizes as including "some of the restrictions: 1) supported by Mr. Gray's testimony; 2) from his

5

treating physician(s) comments; 3) some conclusions from Dr. Snowden's report; and 4) as summarized by the vocational expert that actually examined him." (Doc. No. 17, p. 23) The VE indicated an individual with those restrictions would be unable to work on a full-time basis. (R. 850) The VE stated he was not aware of the results from Gray's functional capacity evaluation, including Gray's inability to manipulate objects at a full production rate. (*Id.*) If the individual in the first hypothetical had a poor ability to handle objects, he would be unable to perform the jobs the VE had listed in response to the first hypothetical question. (*Id.*)

## 2. *Medical and vocational evidence*

Because the time period at issue in this case is April 3, 2003, forward, the court will concentrate on the medical evidence during that time period, with a brief background summary of Gray's condition prior to that time.

Gray has a long history of back problems, and he has undergone four back surgeries, in December 1993, May 2001, April 2002, and September 2002. (*See* R. 318-38, 372-409, 447-58, 463-66) He attended twenty physical therapy sessions following his fourth back surgery, with his last session occurring on April 4, 2003, the date on which Gray's disability ended, according to the Appeals Council. (*See* R. 15, 560-67)

On April 20, 2003, Gray's treating surgeon, Steven J. Meyer, M.D., completed a questionnaire submitted to him by Gray's worker's compensation carrier regarding Gray's back condition. Dr. Meyer indicated Gray's last three back surgeries all had been necessitated by a work-related injury that occurred on December 1, 2000. He opined Gray had reached maximum medical improvement with regard to those injuries as of February 26, 2003, and Gray had sustained a 26% impairment to the body as a whole. He indicated that in the future, Gray likely would require intermittent physical therapy, and

he would require anti-inflammatory medications for the rest of his life. He also indicated Gray potentially could require further surgery. (R. 550-52)

Gray did not follow up with his physicians as often as directed. Doctor's notes indicate he had no insurance and could not afford his blood pressure medications or doctor's visits that were not covered by his worker's comp carrier. (*See* R. 668) Gray was seen at Midwest Health and Wellness Center in Mapleton, Iowa, on July 14, 2004, complaining of increased pain in his left buttock, radiating down the left leg. He stated he had some permanent numbness in his foot due to nerve damage from previous surgeries, and this caused him difficulty with ambulation because at times, he could not tell where he was placing his foot. (*Id.*) He complained of pain with internal and external rotation of both hips, and he was observed to "limp to the left." (R. 667) Notes also indicate Gray appeared to be depressed. He talked in a monotone and had poor eye contact. (*Id.*) He received an injection at the left SI trigger point, and the doctor prescribed Darvocet (a pain medication) and Elavil (a tricyclic antidepressant medication). Gray was referred back to his surgeon for further evaluation. (*Id.*)

Gray was seen at the Wellness Center two weeks later for a recheck of his blood pressure. He stated Darvocet was helping his pain somewhat but he was not sleeping well at night. Notes indicate the Wellness Center had been unable to get Gray an appointment with Dr. Meyer, and Gray was instructed to contact his attorney and his worker's compensation carrier regarding further appointments with Dr. Meyer. (R. 666)

Gray finally saw Dr. Meyer again on September 28, 2004. Notes indicate Gray had "done relatively well until about the past six months when he began to develop increasing pain in his low back to the midline, left[1] sided buttock, and leg pain." (R. 703) Gray reported increasing physical and emotional stress in his life, noting he and his wife were

---

[1]The doctors' notes originally reported "right sided" buttock pain, but handwritten corrections have been indicate "left" sided buttock pain. (R. 703) Left-sided buttock pain would be consistent with Gray's prior report to his family physician. (*See* R. 668)

raising three of their grandchildren. He complained of daily pain in his low back, left buttock, and left leg, and stated he was "becoming increasingly limited in his activities because of this ongoing pain." (*Id.*) On examination, Dr. Meyer noted Gray's affect was "somewhat flat." (*Id.*) Gray exhibited tenderness at the midline of the middle portion of his lumbar spine. X-rays were taken, revealing "some diminution of the L3-4 disc height without spondylolisthesis above his fusion," and "excellent fusion mass, both interbody and laterally." (*Id.*) Dr. Meyer recommended a CT myelogram for further diagnostic evaluation. (*Id.*)

The CT myelogram showed "relatively good stability at L3-4, but . . . a soft tissue density at L3-4 abutting the left L3 nerve root." (R 702) Dr. Meyer opined Gray's back pain could be managed without further surgery. He recommended a series of left-sided nerve root epidural floods, anti-inflammatory medications, and physical therapy. (*Id.*) On November 16, 2004, Gray reported that the epidural nerve root injections had relieved 30% to 50% of his leg pain.[2] He received more injections, and was directed to continue taking anti-inflammatory medications and doing flexibility exercises. (R. 694, 700)

On December 14, 2004, Dr. Meyer noted Gray was "doing relatively well overall." (R. 698) Gray continued to have "some mild occasional aching radicular pain but he [was] much better[.]" (*Id.*) He was directed to continue exercising and received a six-month prescription for Celebrex. (*Id.*)

Dr. Meyer completed another questionnaire for Gray's worker's compensation carrier on February 10, 2005. In the report, the doctor indicated it was still undeterminable whether or not Gray would require further back surgery. He stated, "We are attempting to avoid surgery but the basic pathology persists." (R. 714) Significantly, in this questionnaire, Dr. Meyer indicated Gray's final work restrictions from a functional

---

[2]Handwritten notes from the examination indicate Gray had about 30% relief of his pain. The transcribed notes indicate 50%. (*Compare* R. 694 *with* R. 700) At his previous visit, notes indicate he had experienced about 20% relief of pain from the injections. (R. 695)

capacity evaluation of February 13, 2003, did not need to be lowered further as a result of his ongoing back symptoms.  (R. 715)

The February 13, 2003, FCE referenced by Dr. Meyer was performed by physical therapist Terry Nelson.  (*See* R. 502-48)  Gray "exhibited a fair effort throughout the functional capacity evaluation," and "passed 85% of the validity criteria . . . scored." (R. 509)  The evaluation yielded the following functional capacities for Gray:

- Material handling activities at the light-medium physical demand level; i.e., "occasional material handling activities with 21-35 lbs and less weight, 1-33% of the day." (*Id.*)

- Poor cardiovascular fitness that would not allow him to qualify for a higher physical demand level, and demonstrating that Gray "would not be a good candidate for frequent or constant material handling activities." (*Id.*)

- Ability to sit, stand, walk, and lift below shoulder level frequently; i.e. not more than 66% of the workday.  (R. 506-07)

- Ability to bend, reach above shoulder level, squat, crawl, and kneel occasionally; i.e., not more than 33% of the day.  (*Id.*)

- Ability to perform simple grasping activities, firm grasping activities, fine motor skills, low speed assembly activities, pushing/pulling activities, and lifting/carrying activities, at a light level for his arms and medium level for his legs.  (R. 507)

Gray was seen at the Wellness Center on September 23, 2005.  Notes indicate Gray had not been taking his blood pressure medication because he did not have funds or insurance to pay for his prescriptions.  He complained of ongoing, significant back pain. Doctors prescribed Darvocet-N 100, two pills every six hours as needed for pain, but it was hoped Gray could reduce his Darvocet dosage because he also was prescribed OxyContin 10 mg twice a day.  He also was prescribed blood pressure medication, and

was given samples of medications. (R. 755) Gray called to refill his OxyContin on September 30, 2005, stating he could only afford to buy ten pills at a time, and the pharmacy required a new prescription each time he wanted to purchase ten more pills. (R. 756) Gray was seen at the Wellness Center for follow-up of his blood pressure on October 7, 2005. Gray stated his pain was "under much better control" and he was feeling "much better." (*Id.*)

When Gray was next seen at the Wellness Center, on January 9, 2006, he stated the OxyContin had stopped providing as much relief about two or three weeks earlier. He stated his pain, which historically had been in his low back and down his left leg, now was beginning to go down his right leg as well. He had stopped taking Darvocet due to stomach upset, and he was out of his blood pressure medication. His OxyContin was increased to 20 mg twice daily. Notes also indicate Gray's attorney had requested a functional capacity evaluation, but FCEs were not performed at this office. They recommended Gray see an occupational physician for the FCE. (R. 757)

On January 11, 2006, Gray asked Nurse Practitioner Nelinda Rhode at the Wellness Center to complete a Treating Medical Source Statement-Physical. (*See* R. 760-64) Nurse Rhode explained that she was not certified to do occupational testing, but Gray's attorney asked that she complete the form just based on her own observations of Gray "and with the patient's input." (R. 758) Rhode indicated Gray has impairments consisting of "Spondylolysis lumbar," "Neural foraminal stenosis," and "chronic low back pain with radiculopathy." (R. 760) She opined these impairments reasonably could be expected to produce pain and/or fatigue at a level that would preclude Gray from full-time, competitive work activity on a sustained basis. She noted Gray was "restless, move[d] often when sitting on exam table, need[ed] to get up [and] walk or stand up 10-15 min. af[ter] sitting." (*Id.*)

Rhode indicated Gray needed the freedom to rest, recline, or lie down at his own discretion during a normal work day, and to elevate his legs above his heart several times a day. She noted Gray was taking OxyContin, which could be expected to produce somnolence, dry mouth, hypotension, depression, and slowed cognition, interfering with Gray's ability to work. (*Id.*; R. 762) She opined Gray should lift/carry no more than five pounds occasionally, indicating he had difficulty carrying groceries, and he was "unable to stoop down and pick up 75 [pounds]." (R. 761) She indicated Gray could use his hands for repetitive simple grasping and pushing/pulling, but not for fine manipulation, and he could not use his feet for any type of repetitive movements "due to pain and numbness." (*Id.*) She opined Gray should never stoop, squat, climb, crawl, or reach, and he should bend only occasionally. (*Id.*) She further opined Gray should not be exposed to dust, fumes, gases, or heat, and he could tolerate only moderate exposure to cold and wet conditions. (*Id.*)

Rhode indicated Gray's conditions had lasted, or could be expected to last, for twelve continuous months or longer. (R. 762) She found Gray's complaints of pain and fatigue to be consistent with clinical findings. (*Id.*) She further noted Gray complained of poor sleep and having to get up two to three times each night due to discomfort. (*Id.*)

Regarding Gray's specific functional limitations, Rhode opined Gray could work no more than four hours per day, in total; work while seated no more than thirty minutes at any one time; and work while standing/walking no more than two hours at any one time, and no more than four hours total during a normal work day. (R. 763)

Gray saw Dr. Meyer again on May 24, 2006. Gray complained of increasing low back pain, and right buttock and radicular type right leg pain. He stated he was "having a difficult time sitting, standing, or doing any lifting, pushing, or pulling." (R. 749) On examination, Dr. Meyer noted Gray had "[s]ignificant tenderness and spasm in the paraspinal lumbar musculature, right greater than left"; diminished reflexes bilaterally,

with only a "trace at both knees, absent at both ankles"; and positive straight-leg-raising on the right. (*Id.*) He further noted Gray had excellent motor strength in both lower extremities, hips, knees, and ankles. (*Id.*) He also noted Gray "appear[ed] much older than his stated age." (*Id.*) He opined Gray possibly had "radicular pain due to foraminal encroachment at L2-3 above his fusion with radiographs showing some degenerative disc and facet arthropathy of a moderate degree at this level." (*Id.*) He ordered a CT myelogram for further evaluation.

Gray's CT myelogram failed to show any significant neural element encroachment. When he saw Dr. Meyer on July 26, 2006, he continued to complain of aching pain in his feet and legs, and stated he could only walk about a block at a time. Dr. Meyer noted Gray's pulses were "really significantly diminished," and he referred Gray to another specialist to rule out vascular claudication, noting if that proved unfruitful, a neurologic evaluation might be indicated to rule out peripheral neuropathy. He also referred Gray to physical therapy three times a week for four weeks. (R. 730-31)

On August 20, 2006, Dr. Meyer reviewed the Treating Source Statement-Physical form completed by Nelinda Rhode, ARNP. In response to the question, "Do you agree that Mr. Gray should follow the restrictions [Rhode] has set out at this time as work restrictions for his work related injury of December 1, 2000," Dr. Meyer responded, "Yes," effectively adopting Rhode's suggested restrictions. (R. 734)

Gray obtained vocational evaluations on his own behalf from Richard B. Ostrander, a certified rehabilitation counselor who consults with the Social Security Administration and provides vocational testimony at disability hearings. (*See* R. 776) The first evaluation was completed on April 6, 2005. (Doc. No. 238-47) Ostrander reviewed and summarized Gray's medical records, educational background, and work history; Gray's FCE of February 13, 2003; state agency assessments indicating Gray "would likely need to limit his lifting to 20 pounds occasionally, 10 pounds frequently and would need to periodically

alternate his sitting and standing throughout the day to relieve discomfort" (R. 245); and a psychological evaluation of December 2, 2002, indicating Gray has a verbal IQ of 84, performance IQ of 94, and full-scale IQ of 87, with low-average to average performance in working memory and processing speed, respectively. (R. 244; *see* R. 472-76)) According to Ostrander, the psychologist who performed the assessment opined Gray "would be at some competitive disadvantage when seeking employment," particularly in connection with "jobs that required more than minimum verbal skills, jobs that would require him to interact with the public, or in jobs where he would receive verbally transmitted information or transmit that information to others." (R. 244)

Based primarily on the February 13, 2003, FCE, Ostrander concluded Gray would be limited to light work with a twenty-pound lifting limitation, the ability to change positions from sitting to standing throughout the day to relieve discomfort, and no frequent or constant material handling activities. (R. 246-47) Ostrander went on to explain that of the 1,572 jobs listed in the *Dictionary of Occupational Titles* in the light and unskilled range, "98% require frequent or constant material handling," leaving only 2% of the jobs available to Gray. (R. 247) Further, of that 2%, many of the jobs "would require prolonged or continuous standing," while many others "exist on a very intermittent or sporadic basis and require worker traits that would not fit Mr. Gray's background." (*Id.*) Ostrander concluded, "Therefore based on Mr. Gray's age, his education, work history, lack of transferable skills and significant limitations which prevent him from performing the vast majority of light unskilled employment, it is this rehabilitation counselor's opinion that Mr. Gray is disabled from substantial gainful work." (*Id.*)

On December 19, 2005, Ostrander reviewed the ALJ's decision dated November 22, 2005, and wrote an opinion letter in which he disagreed with the opinions expressed by VE Tucker during the ALJ hearing. (*See* R. 784-86) Ostrander specifically disputed Tucker's estimate of the numbers of jobs available in Iowa that Gray is able to

perform, on the basis that the data employed by Tucker in making his estimations is no longer valid or current. (*See* R. 785) In Ostrander's opinion, based on the February 2003 FCE, "which specifically limits Mr. Gray's material handling capabilities to an occasional basis, he would be unable to perform any of the occupations identified by Dr. Tucker. In fact, all of those occupations identified would require constant material handling capabilities." (R. 785)

Ostrander noted that the ALJ had discounted his opinion because Ostrander had relied on the FCE which, in turn, relied on Gray's poor cardiovascular conditioning, something the ALJ found could be improved. (*See* R. 784; *see also* R. 38-39) Ostrander opined Gray's decreased cardiovascular function reasonably could be "a combination of deconditioning as a result of his limitations caused by his back injury and pain from the back condition." (R. 786) He suggested Gray's "inability to perform frequent or constant material handling activities could very well be a direct function of the pain he experiences due to his back condition which resulted in four surgeries." (*Id.*) Ostrander suggested another FCE would be indicated to determine the issue. (*Id.*)

Ostrander also reviewed the Appeals Council's decision, and on April 10, 2007, he reviewed additional medical records and provided a further opinion regarding Gray's functional capacity. (R. 771-75) He disagreed with the Appeals Council's evaluation of the February 2003 FCE results as indicating Gray "had the ability to perform a range of light to medium exertional level work." (R. 773) Ostrander explained:

> Although it is accurate that the FCE labels a work classifi-
> cation of "light-medium", this is not the same as identifying
> that a worker is capable of performing a range of light to
> medium level work. This classification is based strictly on the
> material handling ability as it relates to the DOT definition of
> work.
>
> .  .  .

. . . [F]rom a practical vocational standpoint, I have never identified work, defined by the *Dictionary of Occupational Titles* as medium, which would actually be within Mr. Gray's capabilities as identified in [the FCE's] assessment. Therefore based on the occasional material handling capabilities alone, Mr. Gray would be limited to light duty.

It is also noted that Mr. Gray has no transferable skills to light and sedentary work and therefore would be relegated to unskilled light and sedentary work. Nearly all of the light duty unskilled work defined by the DOT (98% of all defined job titles) would require frequent or constant material handling activity. The FCE lists 0 pounds for all material handling abilities under frequent and constant and has the additional comment that Mr. Gray would "not be a good candidate to perform frequent or constant material handling activities." This exclusion would not only substantially erode the full range of light duty work but nearly totally eliminate light duty work.

The *Dictionary of Occupational Titles* identifies 1,572 titles that are defined as light duty in exertional level with an SVP of 1 or 2 (unskilled work). Of that number, all but 32 require frequent or constant material handling activity. Of the remaining 32, I have been unable to identify any that would exist in significant numbers that would realistically fit Mr. Gray. Many of these occupations are totally inappropriate or no longer exist in the labor market. Examples are as follows:

| | |
|---|---|
| Showgirl | DOT # 159.647-022 |
| Impersonator, Character | DOT # 299.647-010 |
| Sandwich-Board Carrier | DOT # 299.687-014 |
| Weight Guesser | DOT # 342.357-010 |
| Escort, Personal Service | DOT # 259.367-010 |
| Stand-In (Motion Picture) | DOT # 961.667-014 |

Therefore if one bases an evaluation of Mr. Gray's vocational capabilities on the Functional Capacities Evaluation as indicated in the "Notice of Appeals Council Action", he would be extremely limited in his capacity to perform light duty

> unskilled work and in fact I cannot identify any such
> occupation that realistically would allow him to work at
> substantial gainful activity. Mr. Gray would essentially be
> limited to unskilled sedentary work.

(R. 773-75) Ostrander indicated the Guidelines would mandate "a finding of disabled for a worker of Mr. Gray's age, 53 presently and 50 at the time in question, who is limited to sedentary unskilled work." (R. 775)

### 3.   *Agency decisions*

The ALJ issued his post-hearing decision on November 22, 2005. (R. 31-41) He found that Gray had not performed substantial gainful activity since his alleged disability onset date of December 1, 2000. He found Gray has severe impairments consisting of "status post multiple surgeries involving L3-S1 for degenerative disc disease and hypertension." (R. 40) However, he further found these impairments, either singly or in combination, do not meet the Listing level of severity. (*Id.*)

The ALJ found Gray's subjective complaints regarding the intensity and severity of his symptoms were not fully credible. The ALJ noted Gray "testified he assisted his wife with caring for three grandchildren, aged seven, five and two years old. He drove the children to school and picked them up in the afternoon. He assisted with the two year old in daily care activities. Although [Gray] testified his doctor had recommended he should not work during his last visit, there is no treatment record in evidence with that statement." (R. 38)

The ALJ based his residual functional capacity assessment primarily on the February 2003 FCE, "with the exception of the assertion of limited material handling since that was based on heart rate and would improve with increased cardiovascular conditioning, i.e., was not due to a medically determinable impairment." (*Id.*) Because Ostrander had based his opinion "on that factor"; i.e., Gray's limited material handling

ability, the ALJ gave no weight to Ostrander's opinion. (R. 38-39) The ALJ also noted the following regarding Ostrander's opinion: "The opinion is also nebulous in nature and it is unclear if the basis for the opinion is well founded or speculative in nature." (R. 39)

The ALJ concluded Gray has the ability to lift twenty to thirty-five pounds occasionally and ten to twenty pounds repeatedly; occasionally bend, stoop, squat, kneel, crawl, and climb; and stand/walk a total of six hours and sit for six hours in an eight-hour work day. (R. 39) Based on the VE's response to the ALJ's first hypothetical question, the ALJ found Gray could perform jobs that exist in significant numbers in the national economy, including "production assembler, laundry folder or bakery worker," and Gray therefore was not disabled. (R. 39, 41)

The Appeals Council adopted the ALJ's decision that Gray was not disabled beginning on April 4, 2003, but not for the period from December 1, 2000, through April 3, 2003. (R. 13) The Appeals Council adopted the ALJ's finding that Gray has severe impairments consisting of "hypertension and history of a back injury with subsequent multiple surgeries," and the ALJ's conclusion that Gray's impairments do not rise to the Listing level of severity. (*Id.*)

The Appeals Council found Gray's subjective complaints to be "fully credible for the period prior to April 4, 2003 but not thereafter." (R. 14) The Appeals Council noted the state agency consultants, upon whose opinions the ALJ had relied, did not have the benefit of additional medical evidence regarding Gray's last two back surgeries, the recovery from which would have precluded him from performing "even sedentary work on a sustained basis." (*Id.*) The Appeals Council then found as follows:

> However, beginning on April 4, 2003, [Gray] experienced
> medical improvement and the medical improvement is related
> to [his] ability to work because the decrease in the severity of
> the signs, symptoms and laboratory findings resulted in an
> increase in his residual functional capacity (20 CFR
> 404.1594(b)(3)). Therefore, the Appeals Council finds that

17

> beginning on April 4, 2003, [Gray] experienced medical
> improvement to the extent that he regained the ability to
> perform a range of light exertional level work that involves
> lifting and carrying 20 pounds occasionally and 10 pounds
> frequently, standing and/or walking 6 hours in an 8-hour
> workday, sitting 6 hours in an 8-hour workday with no more
> than occasional bending, stooping, squatting, kneeling,
> crawling and climbing.

(*Id.*)  The Appeals Council further found "the medical evidence of record for the period

beginning on April 4, 2003, lacks consistent evidence of sensory, motor or reflex deficits

and no evidence of significant recurrent disc herniation."  (R. 15)

The Appeals Council found Gray cannot perform his past relevant work "since he

is limited to performing a range of light exertional level work," and he "does not have

transferable work skills from past relevant work that transfer to occupations consistent with

his residual functional capacity."  (R. 14)  The Appeals Council accepted VE Tucker's

testimony, based on the ALJ's first hypothetical question, that Gray would be able to

perform a range of light work.  (R. 15)  The Appeals Council specifically referenced

Ostrander's opinion letters and found his arguments provided no basis to change the

Appeals Council's decision.  (*Id.*)  The Appeals Council further indicated the additional

medical evidence submitted by Gray for the period following April 4, 2003, contained

information that was "consistent with the medical findings and opinions already of record."

(*Id.*)


## III.  *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF,*
## *AND THE SUBSTANTIAL EVIDENCE STANDARD*

### *A.  Disability Determinations and the Burden of Proof*

Section 423(d) of the Social Security Act defines a disability as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and

speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &*

*Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Gray argues the ALJ erred in rejecting the opinions of Dr. Meyer, Nurse Rhode, the psychologist who evaluated Gray in 2002, and VE Ostrander. He further argues those opinions, taken together, support a finding that he has been disabled from December 1, 2000, onward. (Doc. No. 17, pp. 26-35)

Gray argues that as his treating physician, Dr. Meyer's opinions were entitled to great weight, and they should have been given deference over those of consulting physicians. (Doc. No. 17, p. 27, citing *Metz v. Shalala*, 49 F.3d 374, 378 (8th Cir. 1995); *Singh v. Apfel.*, 222 F.3d 448 (8th Cir. 2000); *Cunningham v. Apfel*, 222 F.3d 498 (8th Cir. 2000)) He notes Dr. Meyer has been treating him since 2001, and performed some of his back surgeries. Dr. Meyer opined Gray would need further physical therapy in the future, and anti-inflammatory medications for the rest of his life. He also has not ruled out the possibility that Gray may need further back surgery. (*See* R. 550-52, 714)

Gray further argues the opinions of Nurse Rhode are entitled to substantial weight because she is part of a team of medical practitioners treating Gray, and Dr. Meyer agreed with her assessment of Gray's functional capacity. Gray argues Rhode's opinions "are not inconsistent with the medical record and as an actual health provider her opinion should have been thoroughly discussed." (Doc. No. 17, p. 30, citing *Duncan v. Barnhart*, 368 F.3d 820, 823 (8th Cir. 2004))

The Commissioner argues Dr. Meyer's opinion that Gray would need physical therapy and anti-inflammatory medications is not evidence that Gray is disabled from all types of work. He notes that as of April 20, 2003, Dr. Meyer had released Gray to return to work with restrictions, and at that time, Gray was not scheduled for any further treatment. (Doc. No. 20, p. 7, citing R. 550-51) The Commissioner argues Dr. Meyer's "conclusory checkmark" indicating he agreed with Rhode's assessment of Gray's functional abilities "is not worthy of much weight and the ALJ/Appeals Council committed no error in affording it little probative value." (Doc. No. 20, p. 9, citing *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001))

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by the medically acceptable clinical and laboratory evidence.'" *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002); *accord Reed v. Barnhart*, 399 F.3d 917, 920

(8th Cir. 2005). To be controlling, a treating physician's opinion must be well-supported and not inconsistent with other substantial evidence in the record. *Reed*, 399 F.3d at 920 (citing *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)); *see* SSR 96-2p. The opinions of "other" medical sources, such as Nurse Rhode, provide "appropriate sources of evidence regarding the severity of a claimant's impairment, and the effect of the impairment on a claimant's ability to work." *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003) (citing 20 C.F.R. § 404.1513(d)(1)). At the time Rhode gave her opinion of Gray's functional capacity, she had been seeing him regularly for "long enough to have obtained a longitudinal picture of [his] impairment." *Id.* Her opinion therefore was entitled to more weight than the opinions of non-treating and non-examining physicians. *Id.*

Dr. Meyer did not simply respond to a single question with a checkmark. The record indicates Dr. Meyer reviewed the functional capacity questionnaire completed by Rhode before he indicated, with his "conclusory checkmark," that he agreed with that assessment. Dr. Meyer adopted Nurse Rhode's assessment as his own, and Rhode's opinions therefore were entitled to substantial weight. Rhode's assessment is well-supported by the treatment notes and other medical evidence of record, and is not inconsistent with other substantial evidence of record. As a result, the Appeals Council erred in failing to give appropriate weight to the opinions of Dr. Meyer and Nurse Rhode that Gray could work no more than four hours per day, in total, and he would need the freedom to rest, recline, or lie down as needed, and to elevate his legs above his heart several times during the day – conclusions that obviously would preclude Gray from any type of competitive employment.

It is not significant that as of spring 2003, Gray did not have further treatment scheduled with Dr. Meyer. The fact that no further treatment was scheduled at that time does not mean no further treatment would be required in the future. In addition, the

record indicates Gray's failure to obtain treatment as often as recommended was due to financial hardship; he had no insurance and no funds to pay for treatment that was not pre-authorized by his worker's compensation carrier.

Nevertheless, there is a significant gap in treatment from April 2003, to July 2004, when Gray again began seeing doctors regularly. Despite his lack of funds, it does not appear from the record that Gray's condition was disabling to a degree that caused him to seek emergency services, or to seek free or indigent health care services to address his pain. From the record evidence, it appears Gray's condition did not worsen to a degree that compelled him to seek medical treatment again until July 2004, when he again began seeing doctors regularly.

Since July 14, 2004, the evidence indicates Gray's condition has continued to deteriorate. Objective examination findings have included significant muscle spasms, diminished reflexes, and significantly diminished pulses. These are not findings that can be "faked," nor is there any indication in the record that anyone ever thought Gray was malingering. The court discounts the ALJ's finding that Gray's daily activities exhibited a broader functional ability than Gray described. Driving his grandchildren to and from school does not demonstrate that Gray is able to work, and the record does not contain evidence that in helping to care for his two-year-old grandchild, Gray performed activities inconsistent with his allegation of disabling limitations.

The undersigned finds the record evidence from July 14, 2004, forward overwhelmingly supports Gray's claim that he is disabled, and the record does not contain substantial evidence to support the Commissioner's denial of benefits for that time period. The overwhelming evidence of record supports an immediate award of benefits for the period July 14, 2004, forward. The court further finds that for the period from April 3, 2003, to July 14, 2004, substantial evidence supports the Commissioner's decision that Gray was not disabled.

In reaching this conclusion, the court has not relied on the vocational opinions expressed by Ostrander. Although well-supported and persuasive, Ostrander's opinions are based largely on Gray's limited handling abilities. The ALJ properly concluded the record does not contain substantial evidence to support a finding that any limitation on Gray's handling abilities is due to a medically-determinable impairment, nor has Gray alleged he is disabled due to an inability to perform material handling functions.

Because the court has found the medical evidence of record demonstrates Gray is disabled, the court also has not addressed Gray's argument that the results of his 2002 psychological evaluation should have been factored into the hypothetical questions posed to the VE during the ALJ hearing.

## IV. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be **affirmed in part and reversed in part**, with remand for calculation and award of benefits from July 14, 2004, forward.

**IT IS SO ORDERED.**

**DATED** this 20th day of November, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.