IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

EDWIN C. GRAY, SR.,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. C 07-4067-MWB

**ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*II. LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*III. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A. Gray's Disability from April 4, 2003 to July 13, 2004* . . . . . . . . . . . . . 5
    *B. Gray's Disability from July 14, 2004, Forward* . . . . . . . . . . . . . . . . 8

*IV. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*I. INTRODUCTION*

    On October 2, 2003, plaintiff Edwin Gray filed an application for Title II disability insurance benefits.[1] In his application, Gray alleges a disability onset date of December

---

    [1] Title II of the Social Security Act provides insurance benefits to individuals who
(continued…)

1, 2000. The causes of his disability, according to Gray, are back problems and nerve damage resulting from numerous back surgeries. Gray alleges that these conditions prevent him from standing, sitting, or driving for extended periods of time and restrict his ability to lift. Gray's application for benefits was denied initially and on reconsideration. An Administrative Law Judge ("ALJ") held a hearing, as requested, on Gray's claim on May 5, 2005. The ALJ issued a decision on November 22, 2005, which denied Gray's request for benefits. On June 15, 2007, the Appeals Council concluded that Gray was disabled, for a period of time, between December 1, 2000 through April 3, 2003.[2] However, the Appeals Council found that Gray was not disabled during any other relevant period of time. The Appeals Council's decision was a final decision of the Commissioner of Social Security ("Commissioner").

On August 14, 2007, Gray filed a complaint in this court seeking review of the Commissioner's decision. Doc. No. 5. The undersigned referred the case to Chief United States Magistrate Judge Paul A. Zoss for a report and recommendation. On November 20, 2008, Judge Zoss issued a report and recommendation, which recommends that the undersigned affirm in part and reverse in part the Commissioner's decision—Judge Zoss found that Gray was not disabled from April 4, 2003 through July 13, 2004, but that Gray was disabled from July 14, 2004, forward. Neither Gray nor the Commissioner filed objections to Judge Zoss's report and recommendation.

---

[1](…continued)
establish that they suffer from a physical or mental disability. *See* 42 U.S.C. § 423.

[2] Gray does not challenge the Commissioner's finding that he was disabled from December 1, 2000 to April 3, 2003.

## II. LEGAL STANDARDS

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2008); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any

3

more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

In this case, no objections have been filed. As a result, the court reviews the magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"). The United States Supreme Court has explained that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In applying this standard to review Judge Zoss's report and recommendation, the court must also be mindful of the standards upon which an appealed Commissioner's decision is reviewed. If appealed, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Page*, 484 F.3d at 1042

(quoting *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). Therefore, the court will consider whether Judge Zoss's determinations are clearly erroneous, while keeping in mind that the ALJ must have substantial evidence in support of his factual findings.

## III. LEGAL ANALYSIS

In his report and recommendation (Doc. No. 25), Judge Zoss made two different disability findings for two different periods of time. First, Judge Zoss found that there was substantial evidence to support the Commissioner's decision that Gray was not disabled from April 4, 2003 to July 13, 2004. Second, Judge Zoss found that there was not substantial evidence to support the Commissioner's decision that Gray was not disabled from July 14, 2004, forward, but instead, that there was overwhelming evidence that Gray was disabled during this time period. The court will discuss each of these time periods in turn.

### A. *Gray's Disability from April 4, 2003 to July 13, 2004*

In finding substantial evidence that Gray was not disabled from April 4, 2003 through July 13, 2004, Judge Zoss explains that "there is a significant gap in treatment from April 2003, to July 2004, when Gray again began seeing doctors regularly." This gap in treatment, along with evidence that Gray's condition had improved, provides substantial evidence for the Commissioner's finding that Gray was not disabled during this time period.

In general, the claimant must prove that he is disabled. *See* 20 C.F.R. § 404.1512(a). Despite this burden, the Commissioner must fully and fairly develop the record. *See* 20 C.F.R. § 404.1512; *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994). Once the record is developed, the Commissioner will evaluate a claimant's disability under the familiar five-step analysis found in 20 C.F.R. § 404.1520. *See Jones v. Barnhart*, 335 F.3d 697, 699 (8th Cir. 2003). This process requires the Commissioner to perform a "sequential evaluation process… [in] a series of five steps…." 20 C.F.R. § 404.1520(4). "If [the Commissioner] cannot find that [the claimant] is disabled at a step, [the Commissioner] go[es] on to the next step." *Id.* "Before [the Commissioner] go[es] from step three to step four, [he] assess[es] [the claimant's] residual functional capacity [RFC]." 20 C.F.R. § 404.1520(4). As is the case generally, "[a] disability claimant has the burden to establish [his] RFC." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). In the fifth step, the Commissioner must:

> consider [the] assessment of [the claimant's] residual functional capacity and [the claimant's] age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the Commissioner] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the Commissioner] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520. If the claimant cannot perform past relevant work—under step four—under step five "[t]he Commissioner must then prove, first that the claimant retains the RFC to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790. However, "the burden of persuasion to prove disability and to demonstrate RFC

remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Id.*

Although Gray had undergone multiple back surgeries, there is evidence in the record that Gray's condition had improved as of April 4, 2003. Gray had completed physical therapy on April 4, 2003, an appointment at which he "tolerated all exercises well," and was not provided with further physical therapy orders from Steven Meyer, M.D., Gray's surgeon. R. at 560. In addition, on April 20, 2003 Dr. Meyer released Gray to return to work, with restrictions, and Dr. Meyer did not schedule any further treatment. R. at 550-2. However, Dr. Meyer did note that Gray would need "intermittent [physical therapy] and anti-inflammatory med[ication] for life" and had the "[p]otential [need] for additional surgery." R. at 551.

These findings, which support the proposition that Gray's condition had improved, were followed by the "significant gap in treatment" referenced above. The combination of the positive reports concerning Gray's condition and gap in treatment provide substantial evidence, upon this record, to support the Commissioner's finding that Gray was not disabled. The court recognizes that if Gray had obtained additional medical care during this time period, it is possible that he would have had evidence to preclude a finding that he was not disabled. However, Gray has the burden to prove that he is disabled, *see* 20 C.F.R. § 404.1512(a), and the lack of evidence of disability during this time period is not due to the Commissioner's failure to fully and fairly develop the record. *See* 20 C.F.R. § 404.1512; *Battles v. Shalala*, 36 F.3d at 45. There is evidence that Gray might have avoided healthcare visits during this period of time due to financial constraints, but there is also evidence that the gap in care resulted from his lack of pain or incapacity. Judge Zoss found substantial evidence to support the Commissioner's finding that Gray was not

disabled from April 4, 2003 to July 13, 2004, and therefore Judge Zoss's finding is not clearly erroneous—the court adopts this finding of the report and recommendation.

### *B. Gray's Disability from July 14, 2004, Forward*

Judge Zoss found that the record "from July 14, forward overwhelmingly supports Gray's claim that he is disabled, and the record does not contain substantial evidence to support the Commissioner's denial of benefits from that time period." Doc. No. 25. As a result, Judge Zoss recommended that this court remand Gray's claim for an immediate calculation and award of benefits from July 14, 2004, forward.

This court has the ability "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (sentence four). The Eighth Circuit Court of Appeals has articulated the requirements for remand pursuant to sentence four of section 405(g) as follows:

> Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of "our abundant deference to the ALJ," remand the case for further administrative proceedings. *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir.1998). Consistent with this rule, we may enter an immediate finding of disability only if the record "overwhelmingly supports" such a finding. *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir.1992)*; see Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir.1989); *Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir.1987).

*Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

In this case, although Judge Zoss found Gray was not disabled between April 4, 2003 and July 13, 2004, he found that Gray's condition had so greatly deteriorated by July 14, 2004, to warrant a finding of disability from that date forward. This deteriorating

8

condition was gleaned from records produced by Gray's healthcare visits on and after July 14, 2004. The following is Judge Zoss's summary of the visits:

> Gray was seen at Midwest Health and Wellness Center in Mapleton, Iowa, on July 14, 2004, complaining of increased pain in his left buttock, radiating down the left leg. He stated he had some permanent numbness in his foot due to nerve damage from previous surgeries, and this caused him difficulty with ambulation because at times, he could not tell where he was placing his foot. [R. at 668] He complained of pain with internal and external rotation of both hips, and he was observed to "limp to the left." (R. 667) Notes also indicate Gray appeared to be depressed. He talked in a monotone [voice] and had poor eye contact. (*Id.*) He received an injection at the left SI trigger point, and the doctor prescribed Darvocet (a pain medication) and Elavil (a tricyclic antidepressant medication). Gray was referred back to his surgeon for further evaluation. (*Id.*)
>
> Gray was seen at the Wellness Center two weeks later for a recheck of his blood pressure. He stated Darvocet was helping his pain somewhat but he was not sleeping well at night. Notes indicate the Wellness Center had been unable to get Gray an appointment with Dr. Meyer, and Gray was instructed to contact his attorney and his worker's compensation carrier regarding further appointments with Dr. Meyer. (R. 666)
>
> Gray finally saw Dr. Meyer again on September 28, 2004. Notes indicate Gray had "done relatively well until about the past six months when he began to develop increasing pain in his low back to the midline, left sided buttock, and leg pain." (R. 703) Gray reported increasing physical and emotional stress in his life, noting he and his wife were raising three of their grandchildren. He complained of daily pain in his low back, left buttock, and left leg, and stated he was "becoming increasingly limited in his activities because of this ongoing pain." (*Id.*) On examination, Dr. Meyer noted Gray's affect

9

was "somewhat flat." (*Id.*) Gray exhibited tenderness at the midline of the middle portion of his lumbar spine. X-rays were taken, revealing "some diminution of the L3-4 disc height without spondylolisthesis above his fusion," and "excellent fusion mass, both interbody and laterally." (*Id.*) Dr. Meyer recommended a CT myelogram for further diagnostic evaluation. (*Id.*)

The CT myelogram showed "relatively good stability at L3-4, but . . . a soft tissue density at L3-4 abutting the left L3 nerve root." (R 702) Dr. Meyer opined Gray's back pain could be managed without further surgery. He recommended a series of left-sided nerve root epidural floods, anti-inflammatory medications, and physical therapy. (*Id.*) On November 16, 2004, Gray reported that the epidural nerve root injections had relieved 30% to 50% of his leg pain. He received more injections, and was directed to continue taking anti-inflammatory medications and doing flexibility exercises. (R. 694, 700)

On December 14, 2004, Dr. Meyer noted Gray was "doing relatively well overall." (R. 698) Gray continued to have "some mild occasional aching radicular pain but he [was] much better[.]" (*Id.*) He was directed to continue exercising and received a six-month prescription for Celebrex. (*Id.*)

Dr. Meyer completed another questionnaire for Gray's worker's compensation carrier on February 10, 2005. In the report, the doctor indicated it was still undeterminable whether or not Gray would require further back surgery. He stated, "We are attempting to avoid surgery but the basic pathology persists." (R. 714) Significantly, in this questionnaire, Dr. Meyer indicated Gray's final work restrictions from a functional capacity evaluation of February 13, 2003, did not need to be lowered further as a result of his ongoing back symptoms. (R. 715)

The February 13, 2003, FCE referenced by Dr. Meyer was performed by physical therapist Terry Nelson. (See R. 502-48) Gray "exhibited a fair effort throughout the functional capacity evaluation," and "passed 85% of the validity criteria . . . scored." (R. 509) The evaluation yielded the following functional capacities for Gray:

- Material handling activities at the light-medium physical demand level; i.e., "occasional material handling activities with 21-35 lbs and less weight, 1-33% of the day." (*Id.*)
- Poor cardiovascular fitness that would not allow him to qualify for a higher physical demand level, and demonstrating that Gray "would not be a good candidate for frequent or constant material handling activities." (*Id.*)
- Ability to sit, stand, walk, and lift below shoulder level frequently; i.e. not more than 66% of the workday. (R. 506-07)
- Ability to bend, reach above shoulder level, squat, crawl, and kneel occasionally; i.e., not more than 33% of the day. (*Id.*)
- Ability to perform simple grasping activities, firm grasping activities, fine motor skills, low speed assembly activities, pushing/pulling activities, and lifting/carrying activities, at a light level for his arms and medium level for his legs. (R. 507)

Gray was seen at the Wellness Center on September 23, 2005. Notes indicate Gray had not been taking his blood pressure medication because he did not have funds or insurance to pay for his prescriptions. He complained of ongoing, significant back pain. Doctors prescribed Darvocet-N 100, two pills every six hours as needed for pain, but it was hoped Gray could reduce his Darvocet dosage because he also was prescribed OxyContin 10 mg twice a day. He also was prescribed blood pressure medication, and was given samples of medications. (R. 755) Gray called to refill his OxyContin on September 30, 2005, stating he could only afford to buy ten

pills at a time, and the pharmacy required a new prescription each time he wanted to purchase ten more pills. (R. 756) Gray was seen at the Wellness Center for follow-up of his blood pressure on October 7, 2005. Gray stated his pain was "under much better control" and he was feeling "much better." (*Id.*)

When Gray was next seen at the Wellness Center, on January 9, 2006, he stated the OxyContin had stopped providing as much relief about two or three weeks earlier. He stated his pain, which historically had been in his low back and down his left leg, now was beginning to go down his right leg as well. He had stopped taking Darvocet due to stomach upset, and he was out of his blood pressure medication. His OxyContin was increased to 20 mg twice daily. Notes also indicate Gray's attorney had requested a functional capacity evaluation, but FCEs were not performed at this office. They recommended Gray see an occupational physician for the FCE. (R. 757)

On January 11, 2006, Gray asked Nurse Practitioner Nelinda Rhode at the Wellness Center to complete a Treating Medical Source Statement-Physical. (See R. 760-64) Nurse Rhode explained that she was not certified to do occupational testing, but Gray's attorney asked that she complete the form just based on her own observations of Gray "and with the patient's input." (R. 758) Rhode indicated Gray has impairments consisting of "Spondylolysis lumbar," "Neural foraminal stenosis," and "chronic low back pain with radiculopathy." (R. 760) She opined these impairments reasonably could be expected to produce pain and/or fatigue at a level that would preclude Gray from full-time, competitive work activity on a sustained basis. She noted Gray was "restless, move[d] often when sitting on exam table, need[ed] to get up [and] walk or stand up 10-15 min. af[ter] sitting." (*Id.*)

Rhode indicated Gray needed the freedom to rest, recline, or lie down at his own discretion during a normal work day, and

to elevate his legs above his heart several times a day. She noted Gray was taking OxyContin, which could be expected to produce somnolence, dry mouth, hypotension, depression, and slowed cognition, interfering with Gray's ability to work. (*Id.*; R. 762) She opined Gray should lift/carry no more than five pounds occasionally, indicating he had difficulty carrying groceries, and he was "unable to stoop down and pick up 75 [pounds]." (R. 761) She indicated Gray could use his hands for repetitive simple grasping and pushing/pulling, but not for fine manipulation, and he could not use his feet for any type of repetitive movements "due to pain and numbness." (*Id.*) She opined Gray should never stoop, squat, climb, crawl, or reach, and he should bend only occasionally. (*Id.*) She further opined Gray should not be exposed to dust, fumes, gases, or heat, and he could tolerate only moderate exposure to cold and wet conditions. (*Id.*)

Rhode indicated Gray's conditions had lasted, or could be expected to last, for twelve continuous months or longer. (R. 762) She found Gray's complaints of pain and fatigue to be consistent with clinical findings. (*Id.*) She further noted Gray complained of poor sleep and having to get up two to three times each night due to discomfort. (*Id.*)

Regarding Gray's specific functional limitations, Rhode opined Gray could work no more than four hours per day, in total; work while seated no more than thirty minutes at any one time; and work while standing/walking no more than two hours at any one time, and no more than four hours total during a normal work day. (R. 763)

Gray saw Dr. Meyer again on May 24, 2006. Gray complained of increasing low back pain, and right buttock and radicular type right leg pain. He stated he was "having a difficult time sitting, standing, or doing any lifting, pushing, or pulling." (R. 749) On examination, Dr. Meyer noted Gray had "[s]ignificant tenderness and spasm in the paraspinal

13

lumbar musculature, right greater than left"; diminished reflexes bilaterally, with only a "trace at both knees, absent at both ankles"; and positive straight-leg-raising on the right. (*Id.*) He further noted Gray had excellent motor strength in both lower extremities, hips, knees, and ankles. (*Id.*) He also noted Gray "appear[ed] much older than his stated age." (*Id.*) He opined Gray possibly had "radicular pain due to foraminal encroachment at L2-3 above his fusion with radiographs showing some degenerative disc and facet arthropathy of a moderate degree at this level." (*Id.*) He ordered a CT myelogram for further evaluation.

Gray's CT myelogram failed to show any significant neural element encroachment. When he saw Dr. Meyer on July 26, 2006, he continued to complain of aching pain in his feet and legs, and stated he could only walk about a block at a time. Dr. Meyer noted Gray's pulses were "really significantly diminished," and he referred Gray to another specialist to rule out vascular claudication, noting if that proved unfruitful, a neurologic evaluation might be indicated to rule out peripheral neuropathy. He also referred Gray to physical therapy three times a week for four weeks. (R. 730-31)

On August 20, 2006, Dr. Meyer reviewed the Treating Source Statement-Physical form completed by Nelinda Rhode, ARNP.[3] In response to the question, "Do you agree that Mr. Gray should follow the restrictions [Rhode] has set out at this time as work restrictions for his work related injury of December 1, 2000," Dr. Meyer responded, "Yes," effectively adopting Rhode's suggested restrictions. (R. 734)

Doc. No. 25.

---

[3] Nurse Practitioner Nelinda Rhode completed the Treating Source Statement-Physical forms on January 11, 2006.

Judge Zoss found that Gray was disabled during this time period primarily from Dr. Meyer's and Nurse Rhode's opinions. The Code of Federal Regulations explains that "[i]f [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). However, as the Commissioner points out, *Piepgras v. Chater*, 76 F.3d 233 (8th Cir.1996), places one limit on the weight of a treating physician's opinion. In *Piepgras*, the Eighth Circuit Court of Appeals found that "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements." *Piepgras*, 76 F. 3d at 236; *see also Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001).

The Commissioner argues that, in relation to Dr. Meyer's endorsement of Nurse Rhode's opinion, "the conclusory checkmark from Dr. Meyer is not worthy of much weight and the ALJ/Appeals Council committed no error in affording it little probative value." Doc. No. 20 (citing *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)) ("the checklist format, generality, and incompleteness of the assessments limit their evidentiary value.").

The court agrees that Dr. Meyer's opinions, as Gray's treating physician, would ordinarily receive controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). However, a portion of Dr. Meyer's overall opinion, so far as it is a simple endorsement of Nurse Rhode's opinion, is clearly similar to a conclusory statement. The record shows that, on August 20, 2006, Dr. Meyer responded to the following:

> Attached hereto are copies of Treating Medical Source Statement-Physical forms completed by Nelinda Rhode,

> ARNP, of Mr. Gray's family doctors' office, on 1/11/06. Do you agree that Mr. Gray should follow the restrictions she has set out at this time as work restrictions for his work related injury of December 1, 2000?

R. at 734. Dr. Meyer simply marked the box following the answer "Yes." Despite the conclusory nature of Dr. Meyer's endorsement of Nurse Rhode's opinion, there are two noteworthy reasons why Judge Zoss's finding that the opinion should be afforded substantial weight is correct and not clearly erroneous.

First, the Eighth Circuit Court of Appeals, in *Piepgras*, minimized the weight given to a treating physician's opinion "when the treating physician's opinion consists of *nothing more* than vague, conclusory statements." *Piepgras*, 76 F.3d at 236 (emphasis added). Similarly, the court in *Holmstrom* discounted treating physician opinions that "were in checklist form, were based on only relatively short-term relationships with [the claimant], and were inconsistent with the medical evidence as a whole." *Holmstrom*, 270 F.3d at 721. The reasoning in this line of cases is inapposite to the case before the court. Dr. Meyer's endorsement of Nurse Rhode's opinion, although important to this court's determination of disability, was a relatively small part of Dr. Meyer's overall opinion. In addition, Dr. Meyer had a long term relationship with Gray, had provided a significant amount of information about his condition that was not in checkmark or conclusory form, and provided opinions consistent with the medical evidence as a whole. *See id*. The court therefore refuses to agree with the Commissioner that Nurse Rhode's opinion, endorsed by Dr. Meyer, has little probative value.

Second, even if Dr. Meyer's endorsement of Nurse Rhode's opinion were governed by the *Piepgras* line of cases, it would still be afforded considerable weight. The Eighth Circuit Court of Appeals has noted that the above explained "conclusory opinion's" evidentiary value is limited and "deserve[s] no greater respect than any other physician's

opinion." *Piepgras*, 76 F.3d at 236. Nurse Rhode's opinion without Dr. Meyer's endorsement would be that of an ARNP (Advanced Registered Nurse Practitioner) and not on par with a "medical opinion" asserted by a physician under 20 C.F.R. § 404.1527(a)(2). *See* 20 C.F.R. § 416.913(d)(1) ("Other sources [as opposed to medical sources] include, but are not limited to: (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicans' assistants, naturopaths, chiropractors, audiologists, and therapists)"). However, even under *Piepgras*, Dr. Meyer, by endorsing Nurse Rhode's opinion with his "conclusory checkmark," raises the status of the opinion to one of a physician, even though it would "deserve[] no greater respect than any other physician's opinion." *See Piepgras*, 76 F.3d at 236.

Nurse Rhode, in the opinion endorsed by Dr. Meyer, found that "Gray could work no more than four hours per day, in total, and he would need the freedom to rest, recline, or lie down as needed, and to elevate his legs above his head several times during the day," and, according to Judge Zoss, her opinion contains "conclusions that obviously would preclude Gray from any type of competitive employment." Doc. No. 25. The Commissioner appears to agree with Judge Zoss that this opinion "obviously precludes Gray from any type of competitive employment," as the Commissioner's brief explains Gray's condition under the opinion as "essentially bedridden." Doc. No. 20. The court concurs with Judge Zoss's finding that the record, including, but not limited to, Dr. Meyer's records as a treating physician and his endorsement of Nurse Rhode's opinion, provides overwhelming evidence that Gray has been disabled since his condition began to deteriorate on July 14, 2004.

Judge Zoss also bolsters his finding of overwhelming evidence by noting the objective nature of Gray's symptoms, which include: "significant muscle spasms, diminished reflexes, and significantly diminished pulses." *Id*. The court agrees with

17

Judge Zoss's reasoning that these symptoms are not easily faked and similarly finds no evidence in the record that Gray was, in fact, faking them.

Lastly, Judge Zoss discounted the ALJ's findings that Gray's ability to drive his grandchildren to and from school was inconsistent with his alleged disability. Upon a review of the record, the court finds that, overall, Gray appeared to provide conscientious reports concerning his inabilities and abilities. Part of this candor was his admission that he was able to play a limited role in caring for his grandchildren. It is also clear from the record, however, that this care was provided not because Gray is free from disability and incapacity, but instead out of an extreme duty to care for children desperately in need of care. Gray reported that caring for his grandchildren has brought him physical and mental discomfort—this court will not add to this discomfort by further delaying receipt of his benefits due to his limited provision of care to his grandchildren. For these reasons, the court finds that Judge Zoss was correct, and not clearly erroneous, in concluding that there is not substantial evidence to support the Commissioner's finding that Gray was not disabled during this time period, and that there is overwhelming evidence to support Grey's claim of disability—the court adopts this finding of the report and recommendation.

## IV. CONCLUSION

The court finds that the Commissioner's determination that Gray was not disabled from April 4, 2003 to July 13, 2004, is supported by substantial evidence in the record. However, the court finds that the Commissioner's determination that Gray was not disabled from July 14, 2004, forward is not supported by substantial evidence on the record. Instead, the record overwhelmingly supports a finding that Gray was disabled from July 14, 2004, forward. Therefore, the court **accepts** Judge Zoss's report and recommendation (Doc. No. 25) and **affirms** the Commissioner's decision that Gray was not disabled from

April 4, 2003 to July 13, 2004, but **reverses** the Commissioner's decision that Gray was not disabled from July 14, 2004, forward. The court **remands** the case for an immediate calculation and award of benefits for the period of July 14, 2004, forward, consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 20th day of January, 2009.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA